*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

**UNITED STATES**
Appellee

**v.**

**Keith E. BARRY, Senior Chief Special Warfare Operator**
United States Navy, Appellant

**No. 17-0162**
Crim. App. No. 201500064

Argued March 22, 2018—Decided September 5, 2018

Military Judges: A. H. Henderson (USN), and
B. L. Payton-O'Brien, (USN) (trial); and
Vance H. Spath, (USAF) (*DuBay* hearing)

For Appellant: *Lieutenant Jacob E. Meusch*, JAGC, USN (argued); *Commander Richard Federico*, JAGC, USN, *Commander Brian L. Mizer*, JAGC, USN, *David P. Sheldon*, Esq. (on brief); *Lieutenant Christopher C. McMahon*, JAGC, USN.

For Appellee: *Major Kelli A. O'Neil*, USMC (argued); *Lieutenant Megan P. Marinos*, JAGC, USN, and *Brian K. Keller*, Esq. (on brief); *Lieutenant Commander Jeremy R. Brooks*, JAGC, USN, *Lieutenant James M. Belforti*, JAGC, USN, *Lieutenant Taurean K. Brown*, JAGC, USN, *Captain Brian L. Farrell*, USMC, and *Lieutenant Robert J. Miller*, JAGC, USN.

Chief Judge STUCKY delivered the opinion of the Court, in which Judge OHLSON and Senior Judge ERDMANN joined. Judge RYAN filed a separate dissenting opinion in which Judge MAGGS joined.

———————

Chief Judge STUCKY delivered the opinion of the Court.

It is not every day that a general court-martial convening authority begs our forgiveness for his failure of leadership in approving findings he believed should not be approved. As a result of this unusual admission, we granted review to determine whether the most senior officials in the Navy Judge Advocate General's Corps (JAGC) unlawfully influenced the convening authority or created the appearance of doing so. We further specified the issue of whether the Deputy Judge

Advocate General (DJAG), the JAGC's second highest rank-ing officer, is capable of exerting unlawful influence. We hold: (1) that a DJAG can indeed commit unlawful influence; and (2) that the Navy DJAG actually did so in this case.

### I. Procedural History

A military judge sitting alone as a general court-martial convicted Appellant, contrary to his pleas, of a single specifi-cation of sexual assault—forcing his girlfriend to engage in nonconsensual anal sex—in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012). The military judge sentenced Appellant to a dishonorable discharge and confinement for three years. Operating under incorrect advice given by his Staff Judge Advocate (SJA), Commander (CDR) Dominic Jones, the convening authority, Rear Admiral (RADM) Patrick J. Lorge, believed he lacked the discretion to do anything but affirm the findings and sentence. Consequently, he approved the adjudged sentence and ordered the confinement executed.

Realizing the error, the Navy-Marine Corps Appellate Government Division moved to remand for new post-trial processing. The United States Navy-Marine Corps Court of Criminal Appeals (CCA) set aside the convening authority's action, and remanded the record of trial for preparation of a new SJA's recommendation (SJAR) and a new action. *United States v. Barry*, No. NMCCA 201500064 (N-M. Ct. Crim. App. Mar. 16, 2015) (remand order).

On remand, RADM Lorge, now properly advised of the scope of his powers, raised concerns regarding the fairness of Appellant's trial and the appropriateness of Appellant's sen-tence in his new action. There, he included the following un-usual statement:

> In my seven years as a General Court-Martial Con-vening Authority, I have never reviewed a case that has given me greater pause than the one that is be-fore me now. The evidence presented at trial and the clemency submitted on behalf of the accused was compelling and caused me concern as to whether SOCS Barry received a fair trial or an ap-propriate sentence. I encourage the Appellate Court to reconcile the apparently divergent case law ad-dressing the testimony that an accused may pre-

2

sent during sentencing for the purpose of reconsideration under R.C.M. 924. Additionally, having personally reviewed the record of trial, I am concerned that the judicial temperament of the Military Judge potentially calls into question the legality, fairness, and impartiality of this court-martial. The validity of the military justice system depends on the impartiality of military judges both in fact and in appearance. If prejudicial legal error was committed, I strongly encourage the Appellate Court to consider remanding this case for further proceedings or, in the alternative, disapproving the punitive discharge pursuant to Article 66(c)[,] UCMJ, thereby allowing the accused to retire in the rank that he last honorably served.

Notwithstanding those concerns, RADM Lorge ultimately approved the adjudged findings and sentence in unambiguous language: "the sentence as adjudged is approved."[1] The CCA affirmed. *United States v. Barry*, No. NMCCA 201500064, 2016 CCA LEXIS 634, at *37, 2016 WL 6426695, at *12 (N-M. Ct. Crim. App. Oct. 31, 2016).

Appellant filed a timely petition for review, which this Court granted and summarily affirmed on April 27, 2017. *United States v. Barry*, 76 M.J. 269 (C.A.A.F. 2017) (summary disposition). Appellant then timely petitioned for reconsideration, requesting relief on the basis of a May 5, 2017, declaration submitted under penalty of perjury by RADM Lorge, who averred that he "had serious misgivings about the evidence supporting [Appellant's] conviction" and that he "was [initially] inclined to disapprove the findings." RADM Lorge attested that while he ultimately approved the findings, he would not have done so absent the pressure he perceived from senior civilian and military leaders.

In order to resolve this explicit allegation of unlawful influence, this Court granted Appellant's petition for reconsideration and returned the record of trial to the Judge Advocate General (TJAG) of the Navy for further factfinding, under *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411

---

[1] In the absence of contrary evidence, a convening authority approves the findings by approving the sentence. *United States v. Diaz*, 40 M.J. 335, 337 (C.M.A. 1994).

(1967). *United States v. Barry*, 76 M.J. 407 (C.A.A.F. 2017) (summary disposition).

The *DuBay* hearing ordered by this Court was held on September 26 and 27, 2017. In accordance with the requirement of this Court's order that the hearing be conducted by an officer from outside the Navy and Marine Corps, the Chief Judge of the Air Force Trial Judiciary, Colonel (Col) Vance H. Spath, presided. Upon completion of the *DuBay* hearing, the military judge returned the record of the proceeding as well as his findings of fact and conclusions of law to this Court. This Court then granted the specified issue and modified the original granted issue. *United States v. Barry*, 77 M.J. 118 (C.A.A.F. 2017) (order granting review).

## II. Background

The facts underpinning Appellant's conviction for sexual assault are not relevant to the issues before us, which concern only the post-trial processing of Appellant's case. Accordingly, we proceed only with a recitation of those facts that shed light on Appellant's allegation of unlawful influence.

Following the *DuBay* hearing ordered by this Court, the *DuBay* military judge, in relevant part, made the following factual findings:

The central character of this saga, RADM Lorge, was the General Court-Martial Convening Authority (GCMCA) for Naval Region Southwest—San Diego during the processing of Appellant's case. He was an experienced convening authority, and had even served another tour as a GCMCA.

In February 2014, well before the subject case involving Appellant, RADM Lorge received a courtesy office call from Vice Admiral (VADM) Nanette DeRenzi, who, at the time, served as TJAG. During this site visit, VADM DeRenzi discussed with RADM Lorge the realities of the current operating environment for military justice, particularly in relation to sexual assault. Specifically, they discussed the fact that "commanders were facing difficult tenures as convening authorities due to the political climate surrounding sexual assault." She shared that, every few months, a decision in a sexual assault case would lead to increased scrutiny by Con-

gress as well as other political and military leaders. As a result, much of her time was spent testifying and visiting both Capitol Hill and the White House.

VADM DeRenzi made no attempt to influence any action in Appellant's case or any other case then pending before RADM Lorge. She "was simply discussing the realities of the current environment."

The month following VADM DeRenzi's meeting with RADM Lorge, Captain (CAPT) Christopher W. Plummer, acting in RADM Lorge's temporary absence as the GCMCA, referred two allegations of sexual assault against Appellant to a general court-martial. Following Appellant's conviction for a single charge and specification of sexual assault, RADM Lorge received conflicting and erroneous advice with respect to the action he could take in Appellant's case. As a result, his original action was set aside, and Appellant's case was remanded for a new SJAR and action.

During corrective post-trial processing for Appellant's case, RADM Lorge spent two-and-a-half months carefully reviewing the record of trial and the clemency submissions. He developed significant concerns regarding the fairness of Appellant's trial, and believed that Appellant might be innocent. He shared these concerns with multiple people, and discussed his concerns with his SJA, CDR Jones, and other lawyers. Throughout this period, RADM Lorge was "generally aware of the political pressures on the military justice system in relation to sexual assault." While he could not recall specific comments from civilian or military leaders or identify any sexual assault cases that had garnered negative attention, he knew the system was under pressure from "many fronts."

Contemporaneously, CDR Jones, "strongly, and on multiple occasions, advised RADM Lorge not to set aside the findings or sentence in the case or order a retrial." He reminded RADM Lorge of the political pressures on the system and told him not to make a political decision, for those were best left to the appellate courts. CDR Jones also told RADM Lorge that he could not order a new trial for Appellant.

5

On April 30, 2015, RADM Lorge received an office visit from RADM James Crawford, the DJAG of the Navy.[2] While it was a courtesy visit and the two RADMs also discussed other matters, RADM Crawford knew prior to the meeting that RADM Lorge wanted to talk about a particular case. During this meeting, RADM Lorge told RADM Crawford that he was struggling with his decision and that he was troubled by Appellant's case. RADM Crawford advised RADM Lorge that he (Lorge) had smart lawyers so he should let them figure it out. He also either told RADM Lorge "not to put a target on his back" or, through similar language, gave RADM Lorge the impression that failing to approve the findings and sentence would place a target on his back. Shortly after his meeting with RADM Crawford, RADM Lorge shared this comment with Lieutenant Commander (LCDR) John Dowling, the Deputy SJA, who remembered it clearly because he was surprised by it.

RADM Lorge has no recollection of RADM Crawford's comment regarding putting a target on his back and claims that had RADM Crawford said it, he would have taken it as a joke. RADM Crawford denied making the comment. However, RADM Lorge left their meeting believing he received legal advice from RADM Crawford and that approving the findings and sentence was the appropriate course of action in Appellant's case.

RADM Lorge and CDR Jones continued to discuss Appellant's case after RADM Lorge's meeting with RADM Crawford. In an effort to give RADM Lorge another option, CDR Jones suggested adding language to the convening authority's action to signal RADM Lorge's "sincere and strong reservations about [Appellant's] case."

After receiving that advice but prior to taking action, RADM Lorge spoke with RADM Crawford by telephone and discussed the proposed plan of action. While RADM Lorge could not recall any specific advice provided by RADM Crawford during this call, the call left him with the impression

---

[2] Since the events in question, RADM Crawford was promoted to VADM. He now serves as TJAG. Because he was a RADM at all times relevant to Appellant's post-trial processing, we refer to him as such.

that CDR Jones's proposed plan was "the best he could do in [Appellant's] case." As a result, RADM Lorge believed he received legal advice during the course of the phone call.

RADM Lorge continues to believe that Appellant's guilt was not proven beyond a reasonable doubt at his court-martial.

The *DuBay* military judge found that VADM DeRenzi, RADM Lorge, and LCDR Dowling were all credible witnesses in this case. No such finding was made as to RADM Crawford or CDR Jones.

In addition to his findings of fact, the *DuBay* military judge also analyzed the facts and made several conclusions of law. He did so "with full understanding the issue will be reviewed *de novo*." The *DuBay* military judge concluded that RADM Lorge did not take the action he wanted to take in this case. Instead, he was influenced by conversations with senior military leaders, specifically VADM DeRenzi and RADM Crawford in reaching his decision. In particular, VADM DeRenzi, whose comments were made during a courtesy call well before the current case, (unintentionally) drew RADM Lorge's attention to the difficulties faced by commanders and the increased congressional and presidential scrutiny the services faced in sexual assault cases. Nevertheless, the *DuBay* military judge specifically found that RADM Crawford's two more focused discussions with RADM Lorge, which were made in the midst of Appellant's post-trial processing, played a "more concerning" role in RADM Lorge's decision-making process. Moreover, while the *DuBay* military judge made no finding as to whether RADM Lorge believed he received legal advice from VADM DeRenzi, he determined that RADM Lorge believed he received legal advice from RADM Crawford during their discussions, and RADM Lorge relied on this advice when taking action in this case. Ultimately, Chief Judge Spath concluded that, as a result of external pressures, actual or apparent unlawful command influence tainted the final action in Appellant's case.

7

### III. Discussion

### A. A DJAG Can Commit Unlawful Influence

As an initial matter, we must first determine whether a DJAG is capable of unlawfully influencing the action of a convening authority. We review questions of statutory construction de novo. *United States v. Wilson*, 76 M.J. 4, 7 (C.A.A.F. 2017).

Article 37(a), UCMJ, provides that:

> *No person subject to this chapter* may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

10 U.S.C. § 837(a) (2012) (emphasis added). Accordingly, this Court has long recognized that Article 37(a) prohibits unlawful influence by *all persons subject to the UCMJ. United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004).

Pursuant to Article 2(a)(1), UCMJ, all "[m]embers of a regular component of the armed forces" are persons subject to the UCMJ. 10 U.S.C. § 802(a)(1) (2012). As such, a plain reading of Article 2 and Article 37 together makes clear that a DJAG, just like any other military member, is capable of committing unlawful influence. The Government concedes this point, but argues that the DJAG can only commit unlawful influence when he or she acts with the "'mantle of command authority.'" (citation omitted).

This argument fails, for the UCMJ imposes no such requirement. Although our cases have focused on unlawful influence exerted by those in formal command, the plain language of Article 37(a), UCMJ, does not require one to operate with the imprimatur of command, and we decline to read a supposedly implied condition into congressional silence. Congress is presumed to know the law, *see United States v. Kick*, 7 M.J. 82, 85 (C.M.A. 1979), and we have faith that Congress knows how to change the law if it so desires. To date, Congress has elected against predicating the prohibition of unlawful influence upon the mantle of com-

mand authority.[3] Therefore, we hold that a DJAG, even one acting without the mantle of command authority, can commit unlawful influence.

## B. Unlawful Influence in this Case

"This Court regards unlawful '[c]ommand influence' as 'the mortal enemy of military justice.'" *United States v. Kitts*, 23 M.J. 105, 107 (C.M.A. 1986) (alteration in original) (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)). Consequently, "[t]his Court … is dedicated to the Code's objective to protect the court-martial processes from improper command influence." *United States v. Cole*, 17 C.M.A. 296, 297, 38 C.M.R. 94, 95 (1967). We are likewise committed to preventing interference from non-command sources. We take this responsibility seriously, for its fulfillment "is fundamental to fostering public confidence in the actual and apparent fairness of our system of justice." *United States v. Harvey*, 64 M.J. 13, 17 (C.A.A.F. 2006).

As a preliminary matter, we recognize, as noted above, that our case law with respect to unlawful influence has previously concentrated almost exclusively on abuses perpetrated by those in command or those acting with the mantle of command authority. When presented with a more generalized allegation of unlawful influence, however, we see no reason to deviate from the test we have established to evaluate claims of unlawful command influence.

Accordingly, we review allegations of unlawful influence de novo, *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013), assessing findings of fact that inform this legal question under a clearly erroneous standard. *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999). In cases such as here, where a "military judge made detailed findings of fact … and these findings are clearly supported by the record," we adopt them for our analysis. *Id.*

---

[3] Although the second sentence of Article 37(a), UCMJ, does not contain a statutory *requirement* for a mantle of command authority, we note that it may be a relevant factor for determining whether there is a violation of Article 37, UCMJ. *See United States v. Hamilton*, 41 M.J. 32, 37 (C.M.A. 1994).

Actual unlawful influence "occur[s] when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *United States v. Boyce,* 76 M.J. 242, 247 (C.A.A.F. 2017). Appellant bears the initial burden of raising an issue of unlawful influence. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). In order to succeed on appeal, the accused must establish: (1) facts, which if true, constitute unlawful influence; (2) unfairness in the court-martial proceedings (i.e., prejudice to the accused); and (3) that the unlawful influence caused that unfairness. *Boyce,* 76 M.J. at 248 (citing *United States v. Lewis*, 63 M.J. 405, 413 (C.A.A.F. 2006)); *Salyer*, 72 M.J. at 423. While Appellant's initial burden is low, it requires more than mere allegation or speculation. *Salyer*, 72 M.J. at 423; *see also United States v. Ashby*, 68 M.J. 108, 128 (C.A.A.F. 2009) ("Mere speculation … is not sufficient.). Instead, an appellant must show " 'some evidence' " in order to sufficiently raise the issue. *Salyer*, 72 M.J. at 423 (quoting *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)).

Once an appellant meets his initial burden of raising an issue of unlawful influence, the burden shifts to the government to rebut the allegation by persuading the Court beyond a reasonable doubt[4] that: (1) the predicate facts do not exist; (2) the facts do not constitute unlawful influence; or (3) the unlawful influence did not affect the findings or sentence. *Salyer*, 72 M.J. at 423 (citing *Biagase*, 50 M.J. at 151).

Relying on the findings of the *DuBay* military judge, which we conclude are not clearly erroneous, we are left with no choice but to conclude that Appellant met his initial burden by successfully showing "some evidence" of facts which constitute unlawful influence on the part of RADM Crawford.[5] For example, the military judge found that

---

[4] To the extent that our decision in *United States v. Stombaugh*, 40 M.J. 208, 213–14 (C.M.A. 1994), can be construed as requiring the application of a preponderance of the evidence standard for unlawful influence claims, we clarify that the harmless beyond a reasonable doubt standard applies to all claims under Article 37(a), UCMJ.

[5] We conclude that VADM DeRenzi's conversation with RADM Lorge did not constitute unlawful influence. The conversation oc-

RADM Crawford "either told RADM Lorge 'not to put a target on his back' or, by similar comments, left RADM Lorge with the impression that not affirming the findings and sentence in [Appellant's] case would put a target on RADM Lorge's back." Similarly, the military judge determined that a phone call took place between RADM Crawford and RADM Lorge in which the two men discussed the plan proposed by CDR Jones for RADM Lorge's action, namely inserting language that conveyed RADM Lorge's deep-seated reservations, and RADM Lorge left that conversation believing he had received legal advice to the effect that approving the findings and sentence in an action that detailed his strong concerns "was the best he could do in [Appellant's] case."[6]

Additionally, while RADM Lorge testified that he did not perceive any potential threat to his career in the event he disapproved the findings, his sworn statements make clear to us that, due (in no small part) to his conversations with Navy officials including RADM Crawford, RADM Lorge believed harm would befall the Navy if he did not fall in line. In particular, he averred that:

> [A]s I considered whether to disapprove the findings, I was also concerned about the impact to the Navy if I were to disapprove the findings. At the time, the political climate regarding sexual assault in the military was such that a decision to disapprove findings, regardless of merit, would bring hate and discontent on the Navy ….

curred during a courtesy call well before the instant case and merely consisted of two senior officers discussing current events and trends affecting the military. Both temporally and substantively, it stands in a completely different relationship to this case than the actions of RADM Crawford. As such, Appellant has not met his burden of demonstrating unlawful influence under these circumstances.

[6] We reject any suggestion that the provision of such advice was authorized, for the DJAG was not entitled to provide RADM Lorge with legal guidance. While SJAs are statutorily required to do so pursuant to Articles 6(b) and 60(d), UCMJ, 10 U.S.C. §§ 806(b), 860(d) (2012), no such authority extends to senior JAGC leadership.

> … I perceived that if I were to disapprove the findings in the case, it would adversely affect the Navy. Everyone from the President down the chain and Congress would fail to look at its merits, and only view it through the prism of opinion. Even though I believed then, and I believe now, that I should have disapproved the findings, my consideration of the Navy's interest in avoiding the perception that military leaders were sweeping sexual assaults under the rug … affected my decision of whether to approve or disapprove the findings or sentence in this case.

Given RADM Lorge's expressed misgivings concerning Appellant's guilt, his acknowledgment of the role the Navy's reputation played in his decision to approve the findings, and his statements swearing that external pressures informed his action), we further conclude that Appellant has met his burden in demonstrating prejudice and proximate cause. As such, we agree with Chief Judge Spath's determination that, absent external factors, "RADM Lorge would have taken different action in the case."

As Appellant met his initial burden in raising an issue of unlawful influence, the burden shifts to the Government to rebut the allegation beyond a reasonable doubt. *Salyer*, 72 M.J. at 423. This has not been done. Absent clear error, we are bound by the *DuBay* military judge's findings with respect to the predicate facts. *See Villareal*, 52 M.J. at 30. Furthermore, the record clearly demonstrates that, but for external pressures including, but not limited to, RADM Crawford's improper advice, RADM Lorge would have taken different action in Appellant's case.

Such an "improper manipulation of the criminal justice process," *Boyce*, 76 M.J. at 247, even if effectuated unintentionally, will not be countenanced by this Court. While we do not question RADM Crawford's motives or believe he acted intentionally, the plain language of Article 37(a), UMCJ, does not require intentional action. Article 37(a), UCMJ, clearly provides that "[n]o person subject to this chapter may attempt to coerce *or*, by any unauthorized means, influence the action … of any convening, approving, or reviewing authority with respect to his judicial acts." (Emphasis added.) While the dissent interprets "attempt to" as a modifier for

each of the subsequent verbs, and thus reads an intent requirement into Article 37(a), UCMJ, we disagree. "[A]ttempt to coerce" is a separate form of violation than "by any unauthorized means, influence." While we acknowledge that, in the absence of some other indication, a modifier typically applies to an entire series, *see, e.g., Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) (applying the series-qualifier canon to a statute that included a long list of verbs without any adverbs, prepositions, or articles interrupting the sequence of verbs), here the syntax involves something other than an unbroken series of verbs. Instead, we have an adverbial clause—"by any unauthorized means"—that interrupts the sequence of verbs, and is preceded by the coordinating conjunction "or." Under such circumstances, we think it more appropriate to treat "attempt to" as a modifier only as to the nearest reasonable verb—in this case, "coerce." As such, an "attempt to coerce" necessarily requires intent, whereas influencing an action via unauthorized means violates the statute, regardless of intent.[7] In this case, because the impact of RADM Crawford's unauthorized guidance on RADM Lorge's action is undeniable, we cannot escape the conclusion that actual unlawful influence tainted Appellant's case.[8]

### III. Remedy

"We have long held that dismissal is a drastic remedy and courts must look to see whether alternative remedies

---

[7] We concede that our jurisprudence has traditionally recognized unlawful influence only in cases involving intentional interference with the military justice system, *United States v. Barry*, __ M.J. __ (8–9) (C.A.A.F. 2018) (Ryan, J., with whom Maggs, J., joins, dissenting). However, our cases have previously focused on allegations of unlawful *command* influence. Where the mantle of command involvement pertains, this Court has understandably examined the intent of the commander or his proxy in determining whether error was committed. Without such an examination, it would be difficult to distinguish a legitimate exercise of command authority from an illegitimate one.

[8] In light of our conclusion regarding the presence of actual unlawful influence, we need not determine whether, under the facts presented here, apparent unlawful influence also tainted the processing of Appellant's case.

are available." *Lewis*, 63 M.J. at 416 (citation omitted). However, we have not shied away from endorsing this drastic measure in actual unlawful influence cases when warranted. *See Gore*, 60 M.J. at 189 (holding that a military judge did not abuse his discretion by dismissing charges with prejudice). The dismissal of charges is warranted "when an accused would be prejudiced or no useful purpose would be served by continuing the proceedings." *Id.* at 187 (citing *United States v. Green*, 4 M.J. 203, 204 (C.M.A. 1978)). We have further held that "[d]ismissal of charges with prejudice … is an appropriate remedy where the error cannot be rendered harmless." *Lewis*, 63 M.J. at 416 (citing *Gore*, 60 M.J. at 189).

This is a case in which the error cannot be rendered harmless and no useful purpose would be served by continuing the proceedings. In terms of fashioning an appropriate remedy, we note that RADM Lorge has been less than clear as to what exact action he would have taken absent the unlawful influence. We further note that the *DuBay* military judge found that RADM Lorge "would have taken different action in the case, *likely ordering a new trial*." (Emphasis added.) Regardless, it is clear that Appellant would have received some form of clemency.[9] While we decline to fashion a remedy based on what RADM Lorge wished he had done, we are cognizant that any appropriate remedy must serve to protect the court-martial process and foster public confi-

---

[9] We note that the *DuBay* military judge's determination that RADM Lorge would likely have ordered a new trial is contrary to his finding that RADM Lorge believed the prosecution failed to establish Appellant's guilt beyond a reasonable doubt. While Chief Judge Spath uses the term "new trial," in military law that term is reserved for actions taken by higher authority after the convening authority approves the sentence. Article 73, UCMJ, 10 U.S.C. § 873 (2012). A convening authority, however, does have power to grant a rehearing, but only where there is sufficient evidence in the record to support the findings. *See* Article 60(e)(3), UCMJ. Under these circumstances, if RADM Lorge truly believed that Appellant's guilt had not been proven beyond a reasonable doubt, he would have been required to disapprove the findings and sentence and dismiss the charge and specification. Article 60(e)(3), UCMJ.

dence in the fairness of our system. *See Cole*, 17 C.M.A. at 297, 38 C.M.R. at 95; *see also Harvey*, 64 M.J. at 17.

After taking into account the facts and circumstances of this particular case, and in light of the unlawful influence committed by the DJAG, it would be inappropriate for us to subject Appellant to a new convening authority's action or rehearing, particularly as to do so would only serve to lengthen a protracted litigation that has already reached its natural conclusion.

Instead, we believe nothing short of dismissal with prejudice will provide meaningful relief. While we do not reach this conclusion lightly, "the nature of the unlawful conduct in this case, combined with the unavailability of any other remedy that will eradicate the unlawful … influence and ensure the public perception of fairness in the military justice system, compel this result." *Lewis*, 63 M.J. at 416.[10]

## IV. Judgment

The judgment of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The findings and sentence are set aside. The Charge and its Specification are dismissed with prejudice.

---

[10] While we are all in agreement that "Appellant's finding of guilty therefore should not, and may not, stand," *Barry*, __ M.J. at __ (1) (Ryan, J., with whom Maggs, J., joins, dissenting), the dissent believes that Rule for Courts-Martial (R.C.M.) 1107(g) provides a better basis for rectifying the injustice suffered by Appellant. We disagree. We recognize that, under our precedent, a successor convening authority should be guided by the original convening authority's intent. *See, e.g., United States v. Mendoza*, 67 M.J. 53, 54 (C.A.A.F. 2008). Nevertheless, we are not convinced that this Court or anyone else has the power actually to dictate to a new convening authority the content of a corrected action, as R.C.M. 1107(b)(1) clearly provides that "[t]he action to be taken on the findings and sentence is within the sole discretion of the convening authority."

Judge RYAN, with whom Judge MAGGS joins, dissenting.

This case presents the novel and disturbing situation of a convening authority approving a finding of guilty in a case where he not only believed the Government had not proven Appellant's guilt beyond a reasonable doubt, *see* Appendix A, Declaration of RADM Patrick J. Lorge, USN (RET.); Appendix B, Amended Declaration of RADM Patrick J. Lorge, USN (RET.), but further believed that Appellant might be innocent. Appendix A at 1, 3–4; Appendix B at 2, 7.

While Appellant's finding of guilty therefore should not, and may not, stand, the majority's "solution" — to dismiss the charge with prejudice based on actual unlawful influence has no basis in the law.[1] Pressures external to the military justice system — and a convening authority who *feels influenced* by such pressures — are altogether different from a person subject to the Uniform Code of Military Justice (UCMJ) attempting to coerce or influence a convening authority, which is what Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2012) ("Unlawfully influencing action of court"), requires.[2]

In this case, neither RADM Crawford nor Vice Admiral (VADM) DeRenzi nor any other person subject to the UCMJ "attempt[ed] . . . by any unauthorized, means, [to] influence" the convening authority, RADM Lorge. We therefore dissent from the majority's conclusions that there was actual unlawful influence in violation of Article 37(a), UCMJ, and that the charge against Appellant should be dismissed. In our view, the Court should address RADM Lorge's ambiguous and erroneous action directly by using the Court's express authority under Rule for Courts-Martial (R.C.M.) 1107(g) (2016 ed.), to instruct RADM Lorge (or his successor) to withdraw the action and substitute a corrected action disapproving the finding of guilty. This approach, unlike the majority's, would accord with the text of Article

---

[1] Nor does it effectuate Rear Admiral (RADM) Lorge's intent — to find Appellant "not guilty" — which is different than having your charge dismissed post-conviction for other reasons.

[2] While other cases analyzing Article 37, UCMJ, refer to "unlawful *command* influence," we do not take issue with the majority opinion's articulation of Article 37, UCMJ, as a prohibition against "unlawful influence."

37(a), UCMJ, and with our precedents, and it would also provide Appellant with the finding of not guilty to which he is entitled.

## I.

There is no question that RADM Lorge wrongly approved a finding he believed then, and believes now, should not have been approved because he *felt influenced* by external pressures focused on the handling of sexual assault allegations and trials in the military justice system. *See* Appendix A at 2; Appendix B at 5, 6. For example, he said:

> I was also concerned about the impact to the Navy if I were to disapprove the findings. At the time, the political climate regarding sexual assault in the military was such that a decision to disapprove findings, regardless of merit, could bring hate and discontent on the Navy from the President, as well as senators including Senator Kirsten Gillibrand. I was also generally aware of cases from other services that became high profile and received extreme negative attention because the convening authorities upset guilty findings in sexual assault cases.
>
>     . . . I perceived that if I were to disapprove the findings in the case, it could adversely affect the Navy.

Appendix B at 5; *see* Appendix A at 2.

Based on our recent cases, these concerns appear to be both shared by others in the military justice system and reasonably grounded in fact. *See, e.g., United States v. Riesbeck*, 77 M.J. 154, 164 (C.A.A.F. 2018); *United States v. Boyce*, 76 M.J. 242, 245 (C.A.A.F. 2017); Craig Whitlock, *Senator Continues to Block Promotion of Air Force General*, Wash.Post, https://www.washingtonpost.com/world/national-security/senator-continues-to-block-promotion-of-air-force-general/2013/06/06/bbf9ea0a-cee3-11e2-ac03-178510c9cc0a_story.html?utm_term=.0809d4750f83&noredirect=on (June 6, 2013).[3] But these external pressures, discussed by all three opinions in *Boyce*, 76 M.J. at 245; *Boyce*, 76 M.J. at 253 (Stucky, J., dissenting); *Boyce*, 76 M.J. at 255 (Ryan, J., dissenting), emanate from persons who are

---

[3] This article discusses the nomination of Lieutenant General Susan J. Helms, United States Air Force, to become Vice Commander of the Air Force Space Command, which failed in the Senate after she disapproved a finding of guilty in a sexual assault case.

not subject to the UCMJ. *See* Article 2, UCMJ, 10 U.S.C. § 802 (2012).

To the extent that VADM DeRenzi and RADM Crawford discussed either external pressures generally or this case specifically with RADM Lorge, there is no evidence whatsoever that they did so in an attempt to influence RADM Lorge's action in this case. Indeed, the majority concludes directly to the contrary: "VADM DeRenzi . . . (unintentionally) drew RADM Lorge's attention to the difficulties faced by commanders and the increased congressional and presidential scrutiny the services faced in sexual assault cases." *United States v. Barry*, __ M.J. __ , __ (7) (C.A.A.F. 2018); "we do not question RADM Crawford's motives or believe he acted intentionally." *Id.* at __ (12).

The majority nonetheless finds actual unlawful influence on the part of RADM Crawford, and not on the part of VADM DeRenzi, though they both imparted essentially the same message to RADM Lorge. The *DuBay* hearing military judge tarred her with the same brush as RADM Crawford, ultimately concluding that "RADM Lorge was influenced by conversations with senior military leaders; specifically[,] VADM DeRenzi and VADM Crawford when taking action in this case."[4] The majority's analysis both ignores the statutory text and is contrary to our case law on actual unlawful influence.

## A.

Article 37(a), UCMJ, provides that:

> No person subject to this chapter may *attempt to coerce* or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

(Emphasis added.)

This Court reviews questions of statutory construction de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017). Ordinary rules of statutory construction apply to our

---

[4] All of this was compounded by the Staff Judge Advocate's (CDR Jones) "intransigence in his advice to RADM Lorge . . . reaffirming [incorrectly], on multiple occasions, the only course of action was the approval of both findings and sentence."

analysis of both the UCMJ and the *Manual for Courts-Martial, United States* (*MCM*). *United States v. Reese*, 76 M.J. 297, 301 (C.A.A.F. 2017) (citing *United States v. Muwwakkil*, 74 M.J. 187, 194 (C.A.A.F. 2015); *United States v. Custis*, 65 M.J. 366, 370 (C.A.A.F. 2007); *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007). "The plain language [of a statute] will control," unless such an interpretation would "lead to an absurd result." *Lewis*, 65 M.J. at 88 (citations omitted). Statutory language should generally be given its commonly understood and approved meaning. *Morissette v. United States*, 342 U.S. 246, 263 (1952) (Where the statute does not specify the meaning of a word, the "absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."); *United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017); *United States v. Miller,* 67 M.J. 87, 90 (C.A.A.F. 2008).

The text of the statute alone requires that the actor commit the unlawful influence intentionally for a myriad of reasons. First, the word "attempt" denotes an intentional action. *Webster's New International Dictionary of the English Language* 177 (2d ed. 1952) (unabridged) [hereinafter *Webster's Unabridged*] (attempt means "[t]o try; to endeavor to do or perform"). And here, "attempt to" modifies each verb in the list — "coerce or, by any unauthorized means, influence." *See Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) (where there is a string of verbs in a series, a modifier normally applies to the entire series).[5] This interpretation of Article 37(a), UCMJ, is in accord with the "series-qualifier canon," which is the "presumption that when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *Black's Law Dictionary* 1574 (10th ed. 2014) (entry for "series-qualifier canon"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) (discussing this canon and citing, as an example, the Fourth Amendment's phrase "unreasonable searches and seizures," in which the word "unreasonable" qualifies both

---

[5] The majority posits that the presence of the phrase "by any unauthorized means" between the verbs "coerce" and "influence" precludes the use of this canon of construction. *Barry*, __ M.J. at __ (13). This interpretation is contrary to both a plain reading of the text and common sense. *See infra* at pp. 6–8.

"searches" and "seizures"). Under this canon, the word "attempt" in Article 37(a), UCMJ, is a prepositive modifier that applies to the words "to coerce" as well as the words "by any unauthorized means, influence."

Relatedly the title of the section, "Unlawfully influencing action of court," Article 37(a), UCMJ, connotes an "illegal" or "[n]ot lawful" action. *Webster's Unabridged* at 2783; *F.T.C. v. Mandel Bros.*, 359 U.S. 385, 388–89 (1952) (holding that the title of a statutory provision "though not limiting the plain meaning of the text, is nonetheless a useful aid in resolving an ambiguity"). In that context, an "attempt" has consistently been interpreted to require specific intent. *See, e.g.*, Article 80(a), UCMJ, 10 U.S.C. § 880 (2012) (an "attempt" is "[a]n act, done with *specific intent* to commit an offense") (emphasis added); *Braxton v. United States*, 500 U.S. 344, 349, 351 n.\* (1991) (where "the statute does not specify the elements of 'attempt . . . ,' they are those required for an 'attempt' at common law which include a specific intent to commit the unlawful act" (citation omitted)); *see also United States v. Willis*, 46 M.J. 258, 261 (C.A.A.F. 1997).[6]

---

[6] The majority further ignores the renewed importance this Court has placed on requiring mens rea to establish guilt, in light of the Supreme Court's decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015). *See United States v. Haverty*, 76 M.J. 199 (C.A.A.F. 2017) (finding that at least recklessness is required for an accused to be found guilty of violating a lawful regulation where the UCMJ is otherwise silent as to the required mens rea); *United States v. Caldwell*, 75 M.J. 276 (C.A.A.F. 2016) (finding that at least general intent is required for an accused to be found guilty under Article 93, UCMJ); *United States v. Gifford*, 75 M.J. 140 (C.A.A.F. 2016) (finding that at least recklessness is required for an accused to be found guilty of violating a lawful general order under Article 92, UCMJ). While Article 37(a), UCMJ, is not itself a punitive article, its title, "Unlawfully influencing action of court," makes clear that attempting "to coerce, or, by any unauthorized means, influence" is unlawful. This would, in turn, seem to require some mens rea. By way of example, an act of unlawful influence could be prosecuted as "[n]oncompliance with procedural rules" under Article 98, UCMJ, 10 U.S.C. § 898. And the text of Article 98, UCMJ, specifies that the mens rea requirement necessary for a violation is specific intent: "Any person subject to this chapter who — (2) *knowingly and intentionally* fails to enforce or comply with any provision of this chapter regulating the proceedings before, during, or after trial of an accused; shall be punished as a court-martial may direct."

Moreover, both "coerce" and "influence" themselves suggest intentional action, albeit with different connotations — coerce means to "[t]o constrain or restrain by force, esp. by law or authority," and influence means "[t]o alter or move in respect to character, conduct, or the like," *Webster's Unabridged* at 519, 1276, or the "[u]se of pressure, authority, or power, usu[ally] indirectly, *to* induce action or change the decisions or acts of another." *Black's Law Dictionary* at 898 (10th ed. 2014) (emphasis added) (defining "influence"). It simply is not possible, within the context of Article 37(a), UCMJ, to "unintentionally" attempt to coerce or influence a convening authority.

The majority's response to this careful analysis of the statute is to coin a newly minted "adverbial clause" exception to the "series-qualifier canon," to avoid the necessity of showing any influence was intentional. But the bald assertion that the insertion of the phrase "by any unauthorized means" interrupts the sequence of the verbs and thus prevents the series-qualifier canon from applying "attempt" to "by unauthorized means,[7] influence" is both grammatically and logically incorrect. It is true that the syntax of a statutory provision sometimes will indicate that a word does not modify all of the following items in a series. But "[t]he typical way in which syntax" might "suggest no carryover modification" is that some word "will be repeated before the second element." Scalia & Garner, *supra* p. 4, at 148. For example, the sequence would be interrupted, and the majority's interpretation would be correct, if Article 37(a), UCMJ, repeated the word "may" such that it said: "No person . . . may attempt to coerce, or *may* by unauthorized means, influence." But Article 37(a), UCMJ, does not in fact repeat "may" or any other word that would break the sequence.

The majority's interpretation, created for this case alone, also produces an absurd result that Congress could not have intended and underscores how tortured and strained its misinterpretation of the statute is. *See K Mart Corp. v.*

---

(Emphasis added.) But the majority's view creates the puzzling scenario where someone can unlawfully accomplish something unintentionally.

[7] This phrase is there because there are authorized means to attempt to influence a convening authority, such as the submission of clemency materials. *See* R.C.M. 1105(b)(2)(D) (2016 ed.).

*Cartier, Inc.*, 486 U.S. 281, 324 n.2 (1988) (Scalia, J., with whom Rehnquist, C.J., Blackmun, J., and O'Conner, J., joined, concurring in part and dissenting in part) ("[I]t is a venerable principle that a law will not be interpreted to produce absurd results."). Under the majority's view, Congress has apparently prohibited persons subject to the UCMJ from "attempting to coerce" the action of a convening authority but has not prohibited them from "attempting, by any unauthorized means, to influence" the action of a convening authority, so long as the convening authority is not, in fact, influenced. We see no conceivable reason why Congress would allow a person to attempt, by unauthorized means, to influence a convening authority, or permit an Article 37, UCMJ, violation to turn on a convening authority's susceptibility to "feeling" influenced. Further, under the majority's view in this case, our recent unanimous decision in *Riesbeck*, 77 M.J. 154, would be wrong. There we found an Article 37(a), UCMJ, violation based only on an attempt to influence a court-martial by intentionally stacking the panel with women, without any proof that the attempt succeeded in influencing the outcome.[8] *See also United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994) (holding that "attempts to discourage [a witness] from testifying, especially by his Division Officer, can fairly be construed as unlawful command influence").

Finally, the majority's interpretation also contradicts the position of both parties in this case. At oral argument counsel for Appellant was asked specifically whether the word "attempt" qualifies both "to coerce" and "by any

---

[8] In *Riesbeck*, this Court found that various individuals attempted to influence a servicemember's court-martial for sexual assault by selecting an overabundance of women and victim's advocates to sit on his panel. 77 M.J. at 166. In that opinion, this Court never claimed that the selection of these women and victim's advocates *actually* influenced the result of the appellant's court-martial — only that their selection reflected an attempt to achieve a specific result at the appellant's court-martial. *Id.* at 163−64 ("[T]he final makeup of Appellant's panel was not reflective of a good-faith attempt to either comply with the dictates of Article 25, UCMJ, or create a more *representative* or an *inclusive* panel. Rather, it was riddled with *intentional efforts* to maximize the number of women on the panel because VADM Brown, RADM Colvin, and RADM Ryan thought it was "'very important'" to have a "'large number of women'" on the panel in this sexual assault case." (third emphasis added)).

unauthorized means, influence." Counsel for Appellant answered: "Your honor, I believe it applies to both coerce and influence." Oral Argument at 10:39, *United States v. Barry*, No. 17-0162 (C.A.A.F. Mar. 22, 2018). Government counsel likewise argued in its brief that there could be no unlawful command influence because there was no "unauthorized attempt to influence a court-martial," Brief for Appellee at 37, *United States v. Barry,* No. 17-0162 (C.A.A.F. Jan. 22, 2018), and made similar statements throughout the oral argument.

**B.**

The majority's scant attention to the statutory text leaves its analysis dependent upon its conclusions that: (a) RADM Lorge felt influenced by external pressures, including discussions with RADM Crawford, *Barry*, __ M.J. at __ (11); and (b) that the minimal discussions with RADM Crawford were "improper." *Id.* at __ (12). But the former passive formulation — "person felt influenced" — is not what the statute requires, and the latter is an assertion, with no citation of authority.[9]

In stark contrast, our interpretation of the text is fully consistent with this Court's past jurisprudence, as the majority concedes. *Barry*, __ M.J. at __ n.7 (13 n.7) (acknowledging that "our jurisprudence has traditionally recognized unlawful influence only in cases involving intentional interference with the military justice system"). This Court has consistently held that *actual* unlawful influence requires an intentional manipulation of the military justice system that results in an improper handling or disposition of a case. In other words, where this Court has found *actual* unlawful influence, we have concluded that the actor exerting the unlawful influence did so with specific intent or motive to "unlawfully coerce or influence" the proceedings. *See, e.g.*, *Riesbeck*, 77 M.J. at 165 ("Court stacking is 'a form of unlawful command influence,' and has the improper motive of seeking to affect the findings or

---

[9] We need not reach the issue of what "unauthorized" means here, because we conclude that regardless of its meaning there was no unlawful influence. But we note that there remains a question whether a DJAG speaking with another flag officer, with no conflict of interest and no *attempt* to coerce or influence, would be "unauthorized" unless specifically prohibited by the UCMJ or *MCM.*

sentence. . . ."); *United States v. Lewis*, 63 M.J. 405 (C.A.A.F. 2006) (finding the orchestrated effort of the trial counsel and staff judge advocate to unseat a military judge constitutes actual unlawful command influence); *United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003) (distinguishing between actual and apparent unlawful command influence because actual unlawful command influence requires intent where apparent unlawful command influence does not); *United States v. Baldwin*, 54 M.J. 308, 310 (C.A.A.F. 2001) ("We have long held that the use of command meetings to purposefully influence the members in determining a court-martial sentence violates, Article 37, UCMJ.") (citations omitted)); *United States v. Upshaw*, 49 M.J. 111, 113 (C.A.A.F. 1998) (finding that "improper motive" is an element of court stacking, a form of actual unlawful command influence").

Of course, in cases of *apparent* unlawful influence, a majority of this Court found that intent on the part of the actor is *not* required. *See generally Boyce*, 76 M.J. at 251 (explaining that no showing of knowledge or intent is required to demonstrate an appearance of unlawful command influence).

Wholly untethered from the requirements of both statutory and case law for finding actual unlawful influence, the majority, in essence, adopts the Court's ruling on *apparent* unlawful influence in *Boyce* to conclude there was *actual* unlawful influence here.

> Such an "improper manipulation of the criminal justice process," *Boyce,* M.J. at 246, *even if effectuated unintentionally*, will not be countenanced by this Court. While we do not question RADM Crawford's motives or believe he acted intentionally, the plain language of Article 37(a), UCMJ, does not require intentional action."

*Barry*, __ M.J. at __ (12) (emphasis added).

The latter assertion of course, is entirely dependent upon the efficacy of the so-called "adverbial clause exception" to the ordinary rules of statutory interpretation, which fails, and the freshly created "mantle of command involvement" requirement for intent, *Barry*, __ M.J. at __ n.7 (13 n.7), for which no authority, beyond the whim of the majority, exists. *See, e.g.*, *Lewis*, 63 M.J. at 413–14 (finding actual unlawful influence despite the absence of a "mantle of command" relationship).

Both the statute and our case law, including our recent decision in *Riesbeck*, require intentional action in cases of actual unlawful influence. *Boyce* certainly held that:

> No showing of knowledge or intent on the part of government actors is required in order for an appellant to successfully demonstrate that an *appearance of unlawful command influence arose in a specific case.*

76 M.J. at 251 (emphasis added).[10] But the Court resolves this case on the ground of *actual* unlawful influence despite explicitly recognizing that any influence by RADM Crawford or VADM DeRenzi was unintentional, *Barry*, __ M.J. at __, __ (7, 12), and implicitly acknowledging that no one subject to the UCMJ *attempted* to "coerce or, by any unauthorized means, influence the action of a court-martial." Article 37(a), UCMJ.

Nor do we understand how the majority (quite modestly) condemns RADM Crawford yet entirely excuses VADM DeRenzi, who the *DuBay* military judge found also influenced RADM Lorge. If the test applied is precedent based on the statutory language of Article 37, UCMJ, neither acted intentionally and there is no actual unlawful influence by either of them. If the test applied is the judicially created one for apparent unlawful influence it turns on effect: even a quick review of the appendices makes clear that RADM Lorge's decision was affected (in small part) by both of them, and that VADM DeRenzi's "discuss[ion of] the realities of the current environment," left a lasting impression on RADM Lorge and, as the *DuBay* military judge found, affected his action in this case.

In holding that RADM Crawford unlawfully influenced RADM Lorge's action while VADM DeRenzi did not, *Barry*, __ M.J. at __ & n.5 (10 & n.5), the majority provides no principled guidance for why RADM Crawford's actions constitute an unintentional, yet "improper manipulation," *Boyce,* 76 M.J. at 247, but VADM DeRenzi's do not, given

---

[10] *But see Boyce*, 76 M.J. at 253−54 (Stucky, J., dissenting) (referring to the standard for apparent unlawful command influence as one that "makes little sense. . . . [I]t is difficult to understand how an objective, disinterested, *fully informed observer*, knowing that there is no actual unlawful influence, 'would harbor a significant doubt about the fairness of the proceeding.'" (quoting *Boyce*, 76 M.J. at 248–49)).

that its new formulation for actual unlawful influence is whether the "person felt influenced." In support of this distinction, the majority offers that VADM DeRenzi's conduct occurred earlier in time and that RADM Lorge believed he was receiving legal advice from RADM Crawford. *Barry*, __ M.J. at __ n.5 (10 n.5).

But notwithstanding these distinctions, the *DuBay* military judge found as fact that RADM Lorge "felt influenced" to take the action he did in Appellant's case by the separate conversations with both RADM Crawford *and* VADM DeRenzi, thus these slightly different facts cannot compel a different result under the majority's new Article 37, UCMJ, "felt influenced" test for actual command influence. Moreover, this bizarre misapplication of its own newly minted test for actual unlawful influence will leave both the field and lower courts floundering to determine how and when unintentional conduct rises to an "unlawful" level or constitutes "improper manipulation."

## II.

The convening authority had the sole discretion to take action on the findings or sentence, Article 60(c), UCMJ, 10 U.S.C. § 860(c) (2012), and had the "unfettered discretion" to modify the findings and sentence of a court-martial. Article 60(c)(2)–(3), UCMJ, 10 U.S.C. § 860(c)(2)–(3)(2012); *United States v. Finster,* 51 M.J. 185, 186 (C.A.A.F. 1999). "Unfettered" means we may not inquire into, and the convening authority need not state, his reasons for the action. R.C.M. 1107(d)(1); *Finster*, 51 M.J. at 186.[11] While a convening authority need not review the case for factual sufficiency, R.C.M. 1107(b)(1) (2012), the rule says nothing about what happens when he has done so and found the facts supporting the conviction unconvincing. And we disagree with the Government's argument that though the convening authority in this case believed, and continues to believe, that Appellant's guilt was not proven beyond a reasonable doubt at his court-martial, RADM Lorge retained

---

[11] We recognize that this discretion has been greatly curtailed by the National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66 §§ 1702(b),(c)(1), 1706, 127 Stat. 955–957, 960 (Dec. 26, 2013), as well as subsequent amendments. However, these changes did not impact offenses alleged to have occurred *before* June 26, 2014, such as in Appellant's case. *See id.* at §§ 1702(b), (c)(1).

the discretion to approve a finding of guilty. Appellee's Motion to Clarify Position in Response to Questions at Oral Argument at 8–9, *United States v. Barry*, No. 17-0162 (C.A.A.F. Apr. 2, 2018). This is particularly so where he has both obliquely suggested in the action itself and then later *affirmatively stated*, that he believed that Appellant was not guilty. Appendix A at 1, 3–4; Appendix B at 2, 7). To hold otherwise would read justice out of the military justice system, particularly where the convening authority himself is the one who told us he acted in error and did not believe the finding of guilty should be approved. In permitting an action disapproving the finding, we are effectuating, not interfering with, his discretion.

The UCMJ itself says nothing about what to do in this situation, and given the uniqueness of RADM Lorge's action, it is not surprising that this Court has not had to address such a situation in the past. The President is permitted to provide rules for the military justice system, Article 36, UCMJ, 10 U.S.C. § 836, so long as they are not contrary to or inconsistent with the UCMJ. *Wilson*, 76 M.J. at 6.

R.C.M. 1107(g) (2016 ed.)[12] is such a rule, offers a solution, and provides as follows:

> (g) *Incomplete, ambiguous, or erroneous action.* When the action of the convening authority or of a higher authority is incomplete or ambiguous or contains error, the authority who took the incomplete, ambiguous, or erroneous action may be instructed by an authority acting under Articles 64, 66, 67, 67a, or 69 to withdraw the original action and substitute a corrected action.

While this is a case of first impression, as detailed below, RADM Lorge's action was both erroneous and ambiguous. As an authority acting under Article 67(c), UCMJ, 10 U.S.C. § 867(c), and as authorized under R.C.M. 1107(g), this Court therefore may and should instruct the convening authority

---

[12] The 2016 version of R.C.M. 1107(g) allows for the correction of a convening authority's action when it simply "contains error," expanding upon the 2012 version which references "clerical error." *Compare* R.C.M. 1107(g) (2016 ed.), *with* R.C.M. 1107(g) (2012 ed.). It is appropriate for this Court to apply the 2016 version of R.C.M. 1107(g), both because our power today is defined by the current version of the rule, and because changes to procedural rules may generally be applied retroactively. *Republic of Austria v. Altmann*, 541 U.S. 677, 693 (2004).

to withdraw the original action and substitute a corrected action with a finding of not guilty. Article 60(c)(1), UCMJ. The majority is hesitant to recognize this Court's ability to order a corrected action reflecting the intent of the original convening authority where there is a successor convening authority, citing the "sole discretion" afforded a convening authority under R.C.M. 1107(b)(1). *See Barry*, __ M.J. at __ & n.10 (15 & n.10). Of course, R.C.M. 1107(g) is an exception to the ordinary "sole discretion" rule and provides this Court the power to instruct a convening authority to replace an erroneous or ambiguous action with a corrected one. And, as has always been the case, where an erroneous or ambiguous action is returned to a successor convening authority, our case law recognizes that the original convening authority's intent ought to guide the manner in which the action is corrected. *See United States v. Mendoza*, 67 M.J. 53, 54 (C.A.A.F. 2008) (citing *United States v. Lower*, 10 M.J. 263, 265 (C.M.A. 1981)).

The majority nonetheless asserts that this Court cannot specify "to a new convening authority the content of a corrected action" when the Court acts under R.C.M. 1107(g). *Barry*, __ M.J. at __ n.10 (15 n.10). They are, quite simply, wrong. The plain language of R.C.M. 1107(g) authorizes this Court to instruct the convening authority to "substitute a corrected action."[13] And we held in *Lower*, 10 M.J. 263, that the corrected action must reflect the original convening authority's intent and, indeed, that there must be evidence that the new convening authority communicated with the original convening authority to ascertain that intent. *Id.* at 265; *see also United States v. Mendoza*, 67 M.J. 53, 54 (C.A.A.F. 2008) (confirming this understanding of *Lower*).[14]

---

[13] The majority recognizes "that, under our precedent, a successor convening authority should be guided by the original convening authority's intent." *Barry*, __ M.J. at __ n.10 (15 n.10), but once again carves out a novel caveat for the purposes of resolving this case. *See*, *e.g.*, *supra* at p. 6 (discussing the majority's "adverbial clause" exception to ordinary rules of statutory interpretation); *supra* at pp. 8–11 (discussing the discordance between the analysis in this case and the careful delineation between actual and apparent unlawful command influence set forth in *Boyce)*; *supra* at pp. 9–10 (discussing the newly minted "mantle of command involvement" rule for intent for purposes of actual unlawful influence.

[14] One necessary exception to the rule in *Lower* is that "a successor convening authority [may] issue an entirely new action

Therefore, it is wholly appropriate for this Court to order the successor convening authority to act in a manner consistent with RADM Lorge's intent when correcting his erroneous and ambiguous action.

Because this Court applies principles of statutory construction to the *MCM*, *United States v. Custis*, 65 M.J. 366, 370 (C.A.A.F. 2007), we give words their ordinary meaning. *See supra* at p. 4. Erroneous is defined as "[c]ontaining error; not conformed to truth or justice; incorrect," where error is defined as "a deviation from, or failure to achieve, the right course or standard." *Webster's Unabridged* at 869; *see also* R.C.M. 1107(g). Certainly, RADM Lorge's action affirming a finding of guilty when he did not believe Appellant's guilt was proved beyond a reasonable doubt, and that he might even be innocent, does "not conform to truth or justice." *Webster's Unabridged* at 869 (2d ed. 1952). RADM Lorge swore to his beliefs in two affidavits: "Upon review of the record, I had serious misgivings about the evidence supporting this conviction. Specifically, I did not believe the evidence supported the alleged victim's account of events. I was inclined to disapprove the findings." Appendix A at 1.; "I was convinced then, and am convinced now, that I should have disapproved the findings." Appendix A at 2; "Upon my review of the record of trial from this case, I did not find that the Government proved the allegation against Senior Chief Barry beyond a reasonable doubt." Appendix A at 3; "I believed then, and I believe now, that I should have disapproved the findings." Appendix B at 5; "I would ask you to forgive my failure in leadership and right the wrong that I committed in this case against Senior Chief Barry; ensure justice prevails and when doubt exists, allow a man to remain innocent." Appendix A at 4. In light of these statements, the *DuBay* hearing military judge found that he

_____

in place of his predecessor *when the original convening authority is unavailable to clarify his intent.*" *United States v. Gosser*, 64 M.J. 93, 97 (C.A.A.F. 2006) (per curiam) (emphasis added) (distinguishing *Lower*). But this exception does not apply here because the original convening authority is available and his intent is known. In addition, a successor convening authority may take a different action when a court orders the convening authority "to take a new, as opposed to a corrected, action." *Mendoza*, 67 M.J. at 55. In this case, however, we would instruct the convening authority to take a "corrected action" under R.C.M. 1107(g), to correct the admitted error in the original action.

took an action he did not want to take in Appellant's case. And RADM Lorge himself recognizes that his action was a violation of his duty. *See* Appendix A at 4. The action in this case was therefore erroneous by any measure.

Ambiguous is defined as "[d]oubtful or uncertain." *Webster's Unabridged* at 81; *compare United States v. Captain*, 75 M.J. 99, 105−06 (C.A.A.F. 2016) (holding that the conflicting language between the approval paragraph and execution resulted in an ambiguous convening authority action that required the convening authority to withdraw the original action and substitute a corrected action), *with United States v. Wilson*, 65 M.J. 140, 141 (C.A.A.F. 2007) ("[W]hen the plain language of the convening authority's action is facially complete and unambiguous, its meaning must be given effect."). RADM Lorge's action was ambiguous because the statements that accompany it cast "doubt" and render "uncertain" his approval of a finding of guilty in Appellant's case. *Webster's Unabridged* at 81.

RADM Lorge's action states:

> In my seven years as a General Court-Martial Convening Authority, I have never reviewed a case that has given me greater pause than the one that is before me now. The evidence presented at trial and the clemency submitted on behalf of the accused was compelling and caused me concern as to whether SOCS Barry received a fair trial or an appropriate sentence . . . .

> Additionally, having personally reviewed the record of trial, I am concerned that the judicial temperament of the Military Judge potentially calls into question the legality, fairness, and impartially [sic] of this court-martial. The validity of the military justice system depends on the impartiality of military judges both in fact and in appearance. If prejudicial legal error was committed, I strongly encourage the Appellate Court to consider remanding this case for further proceedings or, in the alternative, disapproving the punitive discharge.

The discordance between the action taken and both the sentiments included in the above excerpt and RADM Lorge's post-trial affidavits is palpable. *Cf. Captain*, 75 M.J. at 105−06; *United States v. Loft*, 10 M.J. 266, 268 (C.M.A. 1981) (where this Court's predecessor used surrounding documentation to interpret an otherwise unclear convening authority action). Given the above, the question remains how and why the United States Navy-Marine Corps Court of

Criminal Appeals concluded that the finding and sentence "should be approved" without further inquiry. *United States v. Politte*, 63 M.J. 24, 25 (C.A.A.F. 2006) (finding that the lower court erred in failing to return a convening authority's action for clarification where there was ambiguity).

Through the sentiments contained in his convening authority action and in his later affidavits, RADM Lorge both acted erroneously in approving the finding and sentence and introduced obvious ambiguity into his decision. Consequently, this Court should instruct the convening authority to withdraw the action and substitute a corrected action disapproving the finding of guilty pursuant to R.C.M. 1107(g).[15] Only in this way can RADM Lorge's action be corrected to comport with his actual preferred action. *Cf. Gosser*, 64 M.J. at 96 ("When addressing situations that present an ambiguity, [this Court has] concluded the proper course of action is to remand for corrective action under R.C.M. 1107(g)."); *cf. United States v. Cox*, 22 C.M.A. 69, 72, 46 C.M.R. 69, 72 (1972) ("the convening authority is bound by the mandate of the appellate court"); *United States v. Stevens*, 10 C.M.A. 417, 418, 27 C.M.R. 491, 492 (1959) (the action of a convening authority contrary to the order of this Court "[is] void and of no effect").

## III.

There is no question that external pressures known to RADM Lorge and discussed with VADM DeRenzi and RADM Crawford influenced RADM Lorge. His affidavits are replete with references to his concerns about taking the action he wanted to in the face of congressional oversight, political pressures, and specific senators, and he frankly admits that these forces influenced him. Nor, however outré his response, were his concerns unfounded: we are all too

---

[15] The majority suggests that the action RADM Lorge would have taken absent his erroneous consideration of political pressures is unclear. *Barry* __ M.J. at __ (14). However, we know exactly what RADM Lorge would have done absent his erroneous consideration of political pressures, as he stated in his sworn declaration: "Even though *I was convinced then, and am convinced now, that I should have disapproved the findings*, my consideration of the Navy's interest in avoiding the perception that military leaders were sweeping sexual assaults under the rug outweighed that conviction at the time." (Emphasis added.) Issuing a corrected action disapproving the findings would effectuate RADM Lorge's clearly stated intent.

well familiar with the consequences of these myriad forces
on both the military justice system, *see, e.g., Riesbeck*, 77
M.J. at 164; *Boyce*, 76 M.J. at 245, and on individual
convening authorities. *See*, *e.g.*, *supra* note 3. Rather than
contort our Article 37, UCMJ, jurisprudence and blithely
ignore both the discordance of RADM Lorge's action with his
clearly expressed beliefs and the political forces and actors
who are primarily responsible for influencing him, we should
act pursuant to our authority under R.C.M. 1107(g); Article
67(e), UCMJ; *see United States v. Emminizer*, 56 M.J. 441
(C.A.A.F. 2002); *see also Politte*, 63 M.J. at 24, and require
the corrective action to which Appellant is entitled.

APPENDIX A

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ARMED FORCES

UNITED STATES,

       Appellee

v.

Keith E. Barry
Senior Chief Special Warfare
Operator (E-8)
United States Navy,

       Appellant

**DECLARATION OF RADM
PATRICK J. LORGE, USN (RET.)**

Crim.App. Dkt. No. 201500064

USCA Dkt. No. 17-0162/NA

## TO THE HONORABLE JUDGES OF THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES:

I, Patrick J. Lorge, USN (ret), do hereby swear and attest that the following is true and accurate to the best of my knowledge:

1. I am a retired Rear Admiral in the United States Navy.

2. In 2015, I was the General Court-Martial Convening Authority in the matter of *United States v. Barry*.

3. In that capacity I reviewed the trial in the post-trial clemency phase.

4. Upon review of the record, I had serious misgivings about the evidence supporting this conviction. Specifically, I did not believe the evidence supported the alleged victim's account of events. I was inclined to disapprove the findings.

5. My Staff Judge Advocate was CDR Dominic Jones and my Deputy Staff

DEFENSE EXHIBIT *NN*
FOR IDENTIFICATION
OFFERED: PAGE____
ADMITTED: PAGE____
1 of 4

Judge Advocate was LCDR Jon Dowling. They advised me on my legal options regarding this case, and tried to convince me to approve the findings in the case.

6. As I considered whether to disapprove the findings, I was also concerned about the impact to the Navy if I were to disapprove the findings. At the time, the political climate regarding sexual assault in the military was such that a decision to disapprove findings, regardless of merit, would bring hate and discontent on the Navy from the President, as well as senators including Senator Kirsten Gillibrand. I was also aware of cases from other services that became high profile and received extreme negative attention because the convening authorities upset guilty findings in sexual assault cases.

7. I perceived that if I were to disapprove the findings in the case, it would adversely affect the Navy. Everyone from the President down the chain and Congress would fail to look at its merits, and only view it through the prism of opinion. Even though I was convinced then, and am convinced now, that I should have disapproved the findings, my consideration of the Navy's interest in avoiding the perception that military leaders were sweeping sexual assaults under the rug outweighed that conviction at the time.

8. Prior to my action in this case, VADM Nanette DeRenzi, the then-Judge Advocate General of the Navy, expressed a similar concern to me about the reputation of the Navy in a conference in my office, although she did not address

2

DEFENSE EXHIBIT $\mathcal{N\!N}$
FOR IDENTIFICATION
OFFERED: PAGE _____
ADMITTED: PAGE _____
2 of 4

this specific case. This was a personal conversation, not part of an instruction or informational course. She conveyed the importance that convening authorities held and how tenuous the ability of an operational commander to act as a convening authority had become, especially in findings or sentences in sexual assault cases due to the intense pressure on the military at the time. She mentioned that every three or four months military commanders were making court-martial decisions that got questioned by Congress and other political and military leaders including the President. This conversation reinforced my perception of the political pressures the Navy faced at the time.

9. In addition to the advice from my staff judge advocates, I also discussed the case with then- RADM Crawford, who is now the Judge Advocate General of the Navy.

10. I have known VADM Crawford since 2001. LT McMahon's questions about my action in this case led me to recall—vaguely—conversations I had with VADM Crawford, in my office and on the telephone, about my action.

11. Upon my review of the record of trial from this case, I did not find that the Government proved the allegation against Senior Chief Barry beyond a reasonable doubt. Absent the pressures described above, I would have disapproved the findings in this case.

DEFENSE EXHIBIT *NN*
FOR IDENTIFICATION
OFFERED: PAGE_____
ADMITTED: PAGE_____
3 of 4

12. On a personal note, I would ask you to forgive my failure in leadership and right the wrong that I committed in this case against Senior Chief Barry; ensure justice prevails and when doubt exists, allow a man to remain innocent.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct.

Date: 5 MAY '17

Signed: _Patrick J. Lorge_
Patrick J. Lorge

4

DEFENSE EXHIBIT NN
FOR IDENTIFICATION
OFFERED: PAGE _____
ADMITTED: PAGE _____
4 of 4

0409

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

| | |
|---|---|
| UNITED STATES,<br><br>      Appellee<br><br>v.<br><br>Keith E. Barry<br>Senior Chief Special Warfare<br>Operator (E-8)<br>United States Navy,<br><br>      Appellant | **AMENDED DECLARATION OF RADM PATRICK J. LORGE, USN (RET.)**<br><br>Crim. App. Dkt. No. 201500064<br><br>USCA Dkt. No. 17-0162/NA |

**TO THE HONORABLE JUDGES OF THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES:**

I, Patrick J. Lorge, USN, do hereby swear and attest that the following is true and accurate to the best of my knowledge:

1. I am a retired Rear Admiral in the United States Navy.

2. I previously submitted a declaration to the United States Court of Appeals for the Armed Services, dated May 5, 2017, in connection with the above-captioned action (the "Declaration"). At that time, I did not have the benefit of counsel. Now that I have had the opportunity to consult with counsel, and to refresh my recollections by reviewing certain documents that I did not have at the time I submitted the Declaration, I submit this amended declaration (the "Amended Declaration") to clarify or elaborate on certain points in the Declaration to make it more complete.

DEFENSE EXHIBIT _00_
~~FOR IDENTIFICATION~~
OFFERED: PAGE _____
ADMITTED: PAGE _____

1 of 7

0410

3. In 2015, I was the General Court-Martial Convening Authority in the matter of *United States v. Barry*.

4. In that capacity I reviewed the trial in the post-trial clemency phase.

5. Upon review of the record, I had serious misgivings about the evidence supporting the conviction. Specifically, I did not believe that the evidence supported the alleged victim's account of events. I was inclined to disapprove the findings.

6. My Staff Judge Advocate was CDR Dominic Jones, and my Deputy Staff Judge Advocate was LCDR Jon Dowling. They advised me on my legal options regarding this case, and tried to convince me to approve the findings in the case.

7. On January 29, 2015, CDR Jones issued a Staff Judge Advocate Recommendation (the "January 29 SJAR") in the case. The January 29 SJAR advised me that I had discretion to take any appropriate action on the findings and sentence in the case. The January 29 SJAR indicated that ALNAV 051/14, which imposed certain restrictions on a General Courts-Martial Convening Authority's clemency powers, did not apply to the case because the offenses occurred before June 24, 2014. Nevertheless, the January 29 SJAR recommended based on the trial record that I approve the sentence as adjudged.

8. On February 26, 2015, before I took action in the case, CDR Jones issued an Addendum to the January 29 SJAR (the "February 26 Addendum"). The

2

DEFENSE EXHIBIT ∞
FOR IDENTIFICATION
OFFERED: PAGE_____
ADMITTED: PAGE_____
2 of 7

0411

February 26 Addendum advised me that, contrary to the January 29 SJAR, ALNAV 051/14 applied to the case and precluded my disapproval of the findings or sentence in the case. The February 26 Addendum concluded that corrective action on the findings and sentence was not appropriate, and, like the January 29 SJAR, recommended based on the trial record that I approve the sentence as adjudged.

9. On February 27, 2015, I approved the sentence in the case. At that time, consistent with the February 26 Addendum, I believed that I lacked authority to disapprove the findings or sentence in the case.

10. On March 16, 2015, the United States Navy-Marine Corps Court of Criminal Appeals set aside my February 27, 2015 action, and ordered that the record be returned to the Judge Advocate General for remand to the Convening Authority for a new action. The order was based upon the Government's Consent Motion to Remand for New Post-Trial Processing, filed March 13, 2015 (the "Government's Consent Motion for Remand"). The Government's Consent Motion for Remand indicated that, while the January 29 SJAR had correctly advised me that new statutory limits on a Convening Authority's clemency powers set forth in ALNAV 051/14 did not apply because the offenses occurred prior to June 24, 2014, the February 26 Addendum had erroneously overruled that advice

3

DEFENSE EXHIBIT _OO_
FOR IDENTIFICATION
OFFERED: PAGE ___
ADMITTED: PAGE ___
3 of 7

0412

and had incorrectly advised me that ALNAV 051/14 precluded consideration of the clemency request in the case.

11. Upon remand from the United States Navy-Marine Corps Court of Criminal Appeals, on April 13, 2015, CDR Jones issued a second Addendum in the case that was intended to supersede the February 26 Addendum (the "April 13 Addendum"). The April 13 Addendum advised me that the advice in the February 26 Addendum regarding the limits of my clemency powers had been incorrect, that the United States Navy-Marine Corps Court of Criminal Appeals had set aside my first action in the case, and that I had authority to disapprove the findings or sentence in the case. The April 13 Addendum nevertheless suggested that corrective action was not warranted in the case, and recommended based on the trial record that I again approve the sentence as adjudged.

12. On June 3, 2015, I approved the sentence as adjudged. Although my June 3 action indicated that my Staff Judge Advocate had retrieved the record to clarify that I had authority to grant clemency, my Staff Judge Advocate did not present to me clearly the scope of my authority here, especially in light of consistently voicing my belief to my Staff Judge Advocate that SOCS Barry should not have been found guilty and that I was inclined to disapprove the findings. As a result, I did not understand at that time that I had sufficient grounds to properly exercise that authority in this case by disapproving the findings or

4

DEFENSE EXHIBIT _OO_
FOR IDENTIFICATION
OFFERED: PAGE_____
ADMITTED: PAGE_____
4 of 7

0413

sentence. My June 3 action noted, however, that I had never reviewed a case that gave me greater pause, and that I had concerns about whether SOCS Barry received a fair trial or an appropriate sentence. My June 3 action therefore strongly encouraged the Appellate Court to review the case for prejudicial error. Also, on June 10, 2015, I sent a letter to VADM Nanette DeRenzi expressing some concerns I had about the case.

13. At times during these post-trial proceedings, as I considered whether to disapprove the findings, I was also concerned about the impact to the Navy if I were to disapprove the findings. At the time, the political climate regarding sexual assault in the military was such that a decision to disapprove findings, regardless of merit, could bring hate and discontent on the Navy from the President, as well as senators including Senator Kirsten Gillibrand. I was also generally aware of cases from other services that became high profile and received extreme negative attention because the convening authorities upset guilty findings in sexual assault cases.

14. I perceived that if I were to disapprove the findings in the case, it could adversely affect the Navy. Everyone from the President down the chain and Congress might fail to look at its merits, and only view it through the prism of opinion. Even though I believed then, and I believe now, that I should have disapproved the findings, my consideration of the Navy's interest in avoiding the

5

DEFENSE EXHIBIT OO
FOR IDENTIFICATION
OFFERED: PAGE _____
ADMITTED: PAGE _____
5 of 7

0414

perception that military leaders were sweeping sexual assaults under the rug, along with the confusion stemming from my Staff Judge Advocate's myriad SJARs providing me with conflicting, confusing, and erroneous legal guidance, affected my decision of whether to approve or disapprove the findings or sentence in this case.

15. Sometime likely after my first action in this case but before I wrote my letter to her (although I do not recall the specific date of this meeting), VADM Nanette DeRenzi, the then-Judge Advocate General of the Navy, expressed a similar concern to me about the reputation of the Navy, in a conference in my office, although she did not address this specific case. This was a personal conversation, not part of an instruction or informational course. She conveyed the importance that convening authorities held and how tenuous the ability of an operational commander to act as a convening authority had become, especially in findings or sentences in sexual assault cases due to the intense pressure on the military at the time. She mentioned that every three or four months military commanders were making court-martial decisions that got questioned by Congress and other political and military leaders including the President. This conversation reinforced my perception of the political pressures the Navy faced at the time.

16. In addition to the advice from my staff judge advocates, I also discussed the case with then-RADM Crawford, who is now the Judge Advocate General of

6

0415

DEFENSE EXHIBIT OO
FOR IDENTIFICATION
OFFERED: PAGE_____
ADMITTED: PAGE_____
6 of 7

the Navy. I was open to discussing the case with VADM Crawford due to the lack of confidence I developed in the advice provided to me by my Staff Judge Advocate.

17. I have known VADM Crawford since 2001. LT McMahon's questions about my action in this case led me to recall—vaguely—conversations I had with VADM Crawford, in my office and on the telephone, about my action.

18. Upon my review of the record of trial from this case, I did not find that the Government proved the allegation against Senior Chief Barry beyond a reasonable doubt. Absent the erroneous and conflicting legal advice I received from my SJAs and the pressures described above, I would have disapproved the findings in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my information, knowledge, and belief.

Date: 21 SEP 17          Signed: _Patrick J. Lorge_
                                 Patrick J. Lorge

DEFENSE EXHIBIT _OO_
FOR IDENTIFICATION
OFFERED: PAGE ___
ADMITTED: PAGE ___
7 of 7

0416